NO. 12-20296
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

ROBERT R. TOLAN, MARIAN TOLAN,

*Plaintiffs-Appellants*

v.

JEFFREY WAYNE COTTON,

*Defendant-Appellee*

_____

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
_____

APPELLEE'S RESPONSE IN OPPOSITION TO
APPELLANTS' PETITION FOR REHEARING EN BANC
_____

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY

WILLIAM S. HELFAND
NORMAN RAY GILES
1200 Smith Street, Suite 1400
Houston, Texas 77002-4401
Tel: (713) 654-9630; Fax: (713) 658-2553
ATTORNEYS FOR APPELLEES

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representatives are made in order that the judges of this court may evaluate possible disqualification or recusal.

A.    Parties:

        Plaintiffs/Appellants:        Robert R. "Robbie" Tolan,
                                        Marian Tolan

        Defendant/Appellee:        Sergeant Jeffrey Wayne Cotton

B.    Former Plaintiffs /Not a Party to Appeal:

                                          Robert "Bobby" Tolan
                                          Anthony Cooper

C.    Former Defendants/Not a Party to Appeal:

                                          Officer John C. Edwards,
                                          Randall C. Mack, Byron Holloway
                                          Cynthia Siegel, Bernard Satterwhite,
                                          City of Bellaire, Texas,
                                          Bellaire Police Department

D.    City's risk fund:        Texas Municipal League
                                          Intergovernmental Risk Pool

E.    Attorneys:

      Plaintiffs/Appellants:           Martin J. Siegel
                                        Law Offices of Martin J. Siegel
                                        Bank of America Center
                                        700 Louisiana, Suite 2300
                                        Houston, Texas 77002

                                        George R. Gibson
                                        Marvin Nathan
                                        Nathan Sommers Jacobs
                                        2800 Post Oak Boulevard
                                        Houston, Texas 77056

                                        Geoffrey Berg
                                        David Berg
                                        Berg & Androphy
                                        3704 Travis Street
                                        Houston, Texas 77002

      Defendants/Appellees:           William S. Helfand
                                        Norman Ray Giles
                                      Chamberlain, Hrdlicka, White,
                                      Williams & Aughtry
                                      1200 Smith Street, Suite 1400
                                      Houston, Texas  77002-4401

                                      */s/William S. Helfand*
                                      Attorney of Record for Appellee

## NO BASIS FOR EN BANC CONSIDERATION EXISTS

The panel decision is consistent with the decisions of this Court and the Supreme Court. As had the District Court, the panel based its decision upon the established legal principles of this Court expressed many years ago in *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) and more recently in *Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir. 2009). The panel, as did the District Court before it, correctly found the record demonstrates that Sergeant Jeffrey Cotton's split-second decision to fire in self-defense was objectively reasonable because a police officer on the scene could reasonably have believed Robbie Tolan's actions presented an imminent threat of serious harm which justified firing in response.[1] Numerous decisions of this Court have consistently held similarly for nearly thirty years.

Curiously, Appellants (hereafter Tolan) come to this Court with the insupportable argument the panel deviated from the relevant decisions of this Court, decisions Tolan did not even rely upon in his presentation to the panel and indeed invited the panel to reject. Less than half the decisions identified in Tolan's opening and reply briefs were reported decisions of this Court or the Supreme

---

[1] The primary factual assertion upon which Tolan relies in seeking en banc review is not admissible evidence. The items within Tab 5 of Tolan's record excerpts (*R 2107-2109* were previously identified as *Plaintiffs' Exhibit 13* in summary judgment briefing) were specifically excluded by the District Court. {*R 2570*}. Sergeant Cotton identified that deficiency in the evidence during his briefing to the panel. Tolan nevertheless simply ignores the District Court's Order excluding the inadmissible information he now primarily relies upon in seeking en banc review.

Court. Tolan instead asked the panel to apply inconsistent decisions of courts other than this Court to overrule the District Court's judgment in favor of Sergeant Cotton, which the District Court reached based upon authority of this Court and the Supreme Court. The panel correctly rejected Tolan's invitation to deviate from controlling precedent of this Court and, like the District Court, based its decision on well supported authorities of this Court and the Supreme Court.

Perversely, Tolan now seeks en banc review of the panel's decision claiming it deviated from the very authority the panel applied in the face of Tolan's reliance upon decisions outside this Court. Consideration by the full Court is not necessary to secure and maintain uniformity of this Court's decisions because the panel issued a decision that appropriately applies the established legal standards of this Court and the Supreme Court, so further review is not warranted under FED.R.APP.P. 35.

Furthermore, en banc review is not warranted because the panel's decision does not conflict with the relevant decisions of the Supreme Court and because there is no current confusion in this Court regarding interpretation of Supreme Court authority regarding qualified immunity. Sergeant Cotton respectfully urges this Court to overrule Tolan's petition for rehearing en banc.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................................... i

NO BASIS FOR EN BANC CONSIDERATION EXISTS .................................... iii

TABLE OF CONTENTS ................................................................................... v

TABLE OF AUTHORITIES ..................................................................................vi

FACTS ................................................................................................................ 1

ARGUMENT AND AUTHORITIES ....................................................................12

I.    The panel correctly applied the factual record to existing
      jurisprudence of this Court and the Supreme Court ......................................12

II.   The panel correctly applied jurisprudence of the Supreme Court.................20

CONCLUSION AND PRAYER ........................................................................ 29

CERTIFICATE OF SERVICE......................................................................... 30

CERTIFICATE OF COMPLIANCE ............................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abbott v. Sangamon County*,
  705 F.3d 706 (7th Cir. 2013) .................................................................28

*Anderson v. Creighton*,
  483 U.S. 635, 107 S.Ct. 3034 (1987)................................................. 16, 23-26, 28

*Brosseau v. Haugen*,
  543 U.S. 194, 125 S.Ct. 596 (2004)...........................................13, 16, 18, 23, 28

*Burke v. Sullivan*,
  677 F.3d 367 (8th Cir. 2012) .................................................................29

*Carnaby v. City of Houston*,
  636 F.3d 183 (5th Cir. 2011) .................................................................19

*Doninger v. Niehoff*,
  642 F.3d 334 (2nd Cir. 2011).................................................................28

*Graham v. Connor*,
  490 U.S. 386, 109 S. Ct. 1865 (1989).........................................................14, 26

*Hathaway v. Bazany*,
  507 F.3d 312 (5th Cir. 2007) .......................................................................15, 16

*Hensley v. Gassman*,
  693 F.3d 681 (6th Cir. 2012) .................................................................28

*Higgins v. Penobscot County Sheriff's Department*,
  446 F.3d 11 (1st Cir. 2006).....................................................................28

*Katz v. U.S.*,
  194 F.3d 962 (9th Cir. 1999) .................................................................25

*Kerns v. Bader*,
  663 F.3d 1173 (10th Cir. 2011) .............................................................29

*Manis v. Lawson*,
  585 F.3d 839 (5th Cir. 2009) .......................................................................18, 19

*Mattos v. Agarano*,
    661 F.3d 433 (9th Cir. 2011) ...................................................................29

*Messerschmidt v. Millender*,
    __, U.S. __, 132 S.Ct. 1235 (2012) .........................................................28

*Ontiveros v. City of Rosenberg*,
    564 F.3d 379 (5th Cir. 2009) ...........................................iii, 12, 15-18, 23

*Pearson v. Callahan*,
    555 U.S. 223, 129 S.Ct. 808 (2009) ...............................21, 22, 27, 28

*Reese v. Anderson*,
    926 F.2d 494 (5th Cir. 1991) ...................................................................15

*Rockwell v. Brown*,
    664 F.3d 985 (5th Cir. 2011) ...................................................................14

*Saucier v. Katz*,
    533 U.S. 194, 121 S.Ct. 2151 (2001) ....................................... 14, 21, 22, 25-28

*Schneyder v. Smith*,
    653 F.3d 313 (3rd Cir. 2011) ...................................................................28

*Terrell v. Smith*,
    668 F.3d 1244 (11th Cir. 2012) ...............................................................29

*U.S. v. McKenzie-Gude*,
    671 F.3d 452 (4th Cir. 2011) ...................................................................28

*Young v. City of Killeen*,
    775 F.2d 1349 (5th Cir. 1985) ............................................. iii, 13, 15

*Youngbey v. March*,
    676 F.3d 1114 (D.C. Cir. 2012) .................................................................29

## OTHER AUTHORITIES

U.S. Constitution........................................................... 13, 16, 19-22, 26

# FACTS

As opposed to "plaintiff's version of the facts," Tolan admittedly relies upon which includes inadmissible assertions,[2] Sergeant Cotton will instead direct the Court to the evidence the District Court found through a detailed analysis and synthesis of the actual facts. While investigating a suspected stolen vehicle, Officer Edwards had four people to watch so he notified the dispatcher to hurry backup officers to the scene. {*R 2628, 1114, 1115, 1013, 1019, 1025, 1110*}. When Sergeant Cotton arrived, Robbie Tolan was lying prone on the porch; Anthony Cooper was on the ground, not necessarily prone; Bobby Tolan was standing next to a vehicle parked in the driveway {*R 992, 1031–32*}; and Marian Tolan was moving around in the front yard. {*R 992, 1032, 1114–15, 2628*}.

<u>Robbie Tolan's Deposition Testimony</u>

Robbie Tolan saw Sergeant Cotton near Cooper and observed Cotton "grab my mother." {*R 1240-43*}. Sergeant Cotton grasped Marian Tolan's arm and guided her parallel to the front of the house and toward the garage door. While Sergeant Cotton moved toward the garage door, he held Marian Tolan's arm, "kind

---

[2]     There is no admissible testimony from Robbie Tolan in the record that "[a]t the time I was shot, I was unarmed, I was on my knees, and I did not have anything in my hands. In the moments leading up to the shooting, I did not make any gesture towards or away from my waistband." This conclusory assertion Tolan heavily relies on in his petition for en banc review is irreconcilable with Robbie Tolan's deposition testimony and does not constitute admissible evidence as the District Court held and Tolan has not appropriately challenged on appeal. {*R 2570 (sustaining objections to Plaintiffs' Ex. 13), R 2107-2109, Appellants' record excerpts Tab 5*}.

of pushing her a little bit, kind of directing her." "There was no tussle. I mean, but she wasn't exactly running over there either." {*R 1244-46*}. When Sergeant Cotton and Marian Tolan reached the garage door, they were "pretty much directly behind [Robbie Tolan]." {*R 1248*}. Still prone on the porch, facing toward Sergeant Cotton, Robbie Tolan turned only his head to the left and looked backwards to follow Sergeant Cotton and Marian Tolan's actions. Robbie Tolan "saw and heard Sergeant Cotton push [Tolan's] mom against the garage door. ... And it made a loud noise." {*R 1249*}. The sight and sound of his mother being pushed against a metal garage door "caused [Robbie Tolan] to want to get up from the position that [he was] laying in . ... because [he was] upset about seeing [his] mother being pushed into a garage door." {*R 1250*}.

> Question:    "[A]m I correct in saying that not only did you want to get up from the position of 'RT' [the position in which he was lying on his stomach on the porch], but you wanted to turned [sic] around to where your mother and Sergeant Cotton were?"
> Answer:      "That I wanted to, yes, sir."
> Question:    **In fact, that's what you were doing at the time you were shot, right**?"
> Answer:    "**True**."
> Question:    "**You were getting up and turning around toward your mother and Sergeant Cotton**?"
> Answer:    "**True**."

{*R 1250*} (emphasis added).

While he was lying prone on the porch, Robbie Tolan had his arms outstretched in front of him. In order to get up he had "to pull [his] arms back

towards kind of [his] chest area and push up...." He "used kind of like a push up

maneuver to get [himself] up." {*R 1259*}. He was "turning, ... pushing up with

[his] hands, and turning towards [his] left." {*R 1260*}.

| | |
|---|---|
| Question: | [Y]ou've been asked to talk about kind of the mechanics of getting up that night. Right? |
| Answer: | Yes. |
| Question: | Just like we're doing here, we're talking about pulling your hands back, push up with both hands, and at the same time that you're turning around, right? |
| Answer: | Yes, sir. |
| Question: | Okay. But, would it be right for me to say, Mr. Tolan, that at the time that you were getting up that morning, would it be right for me to say you really weren't thinking about how you were doing it, right? |
| Answer: | Sure. |
| Question: | In other words, people have asked you, how were you doing it, and you have tried to kind of recreate it in your mind and describe it, right? |
| Answer: | Yes, sir. |
| Question: | But in terms of each thing that you were doing at the moment you were doing it, would it be right for me to say it's not something you were thinking about at the moment that you were doing it? |
| Answer: | Sure |
| Question: | So when you give us a recreation of it, it is your best guess of how you were doing it, right? |
| Answer: | Sure. |

{*R 1260, 2018, 2495, 2496*}.

| | |
|---|---|
| Question: | Now, so as you're getting up and I think you told me you're turning to your left as you're getting up? |
| Answer: | Yes, sir. |
| Question: | Okay. And is Sergeant Cotton -- as you're turning towards Sergeant Cotton, and getting up, is Sergeant Cotton still holding your mother by the arm? |
| Answer: | To my knowledge, yes. |

| | |
|---|---|
| Question: | Okay. And **as you're getting up and turning to your left--by the way, did you get up quickly or slowly**? |
| Answer: | **Pretty quickly, I suppose**. |
| Question: | All right. And as you're getting up, **did you scream or raise your voice and say, "Get your fucking hands off my mom?"** |
| Answer: | **Yes, sir**. |
| Question: | **You were angry by then, right**? |
| Answer: | **Yes, sir**. |
| Question: | And, so, **if somebody said they saw an angry look on your face, you would say, well, that would probably be right, right**? |
| Answer: | **Sure**. |
| Question: | And you would agree with me, wouldn't you, that **saying something like "get your fucking hands off my mom" is an aggressive statement**? You would agree with that, wouldn't you? |
| Answer: | **Sure**. |

{*R 2499-2500*}(emphasis added).

| | |
|---|---|
| Question: | And in turning, are you -- were you able to see Sergeant Cotton's face as you are turning towards him? |
| Answer: | Yes, sir. |

{*R 2500*}.

| | |
|---|---|
| Question: | Did you see Sergeant Cotton actually unholster his weapon? |
| Answer: | Yes, sir. |
| Question: | And would it be right for me to say that you did not see Sergeant Cotton unholster his weapon until you were beginning to get up and turning [sic] toward him? |
| Answer: | Yes, sir. |
| Question: | In other words, from what you observed, **Sergeant Cotton's weapon was holstered up until the time that you hollered to him and began getting up and turning toward him** |
| Answer: | **Sure**. |
| Question: | And then he unholsters his weapon, right? |

4

Answer:      Yes, sir.
Question:    Points it at you, and at the same time, practically
             immediately, is shooting, right?
Answer:      Yes, sir.

{*R 2501* (emphasis added).

"The first thing that Sergeant Cotton did after he fired his weapon was to come over to [Robbie Tolan] and check you for weapons.. . . And when he didn't find a weapon, he specifically said to [Tolan], what were you reaching for, right? True" *Id.*, {*R 2508*}.

<u>Marian Tolan's Deposition Testimony</u>

Marian Tolan's testimony generally supported her son's account. She was asked, "Robb[ie] had gotten up from lying down on the ground, as you and your husband had instructed him to do, without anybody giving him permission to do it or telling him it was okay to do it, when Sergeant Cotton shot him, right?" She answered, "Yes." {*R 1449*}. She was asked, "[h]e was going from laying on the ground to not laying on the ground?" She answered, "Yes." She was asked, "[h]e was in the process of getting up when he got shot, wasn't he?" She answered "Yes." {*R 1449*}. Later in her deposition she was asked, "At the time that Sergeant Cotton fired at Robb[ie], as Robb[ie] was getting off the ground, had anyone checked yet to see whether Mr. Cooper or Robb[ie] Tolan had a weapon?" She answered, "No." The next question posed to her was, **"[w]hether either of those gentlemen had a weapon at the time that Sergeant Cotton responded to**

**Robb[ie] getting up off the ground, can we agree was uncertain**?" She answered, "**It was uncertain**." {*R 1463*}(emphasis added). Marian Tolan also testified that after Sergeant Cotton pushed her against the garage door, Robbie Tolan immediately started to get up from the ground. He told Sergeant Cotton "to get his hands off of his mom." {*R 1489*}. When asked if he actually said "[g]et your fucking hands off my mom," and she answered, "I don't recall him using that word, but he says he did." {*R 1490*}. Marian Tolan agreed it was only after Robbie rose from the porch and uttered an aggressive verbal exclamation that Sergeant Cotton shot Robbie Tolan. {*R 1490*}. She was asked if Sergeant Cotton withdrew his weapon from its holster before firing. She responded, "I didn't see it until then." {*R 1490*}. The three gunshots came immediately after each other, with no delay, and it sounded like one gunshot to her. {*R 1490*}. After the shooting, Sergeant Cotton called paramedics first and then asked Marian Tolan, "Is there anyone else in the house?" When Marian Tolan said, "No," Sergeant Cotton went over to Robbie, "Turned him over and emptied his pockets and said, 'What were you reaching for?" {*R 1491*}. Marian Tolan agreed that from the moment Sergeant Cotton arrived at 804 Woodstock until the time he fired his weapon took 32 seconds. {*R 1493*}.

<u>Deposition Testimony of Sergeant Cotton</u>

As Sergeant Cotton responded to assist Officer Edwards around 2:00 a.m. he heard information the vehicle was stolen. {*R 1012, 1020, 1022*}. Sergeant Cotton heard Officer Edwards broadcast that the felony suspects were moving, and "that he was going to have to take them, meaning he was going to have to address the suspects right now before backup was going to be able to get there." {*R 1022*}. Officer Edwards later transmitted that back up needed to hurry. {*R 1026*}. Sergeant Cotton noticed tension in Officer Edwards's voice and Sergeant Cotton "perceived [Officer Edwards] was in a dangerous situation." {*R 1027*}. Upon arriving on the scene, Sergeant Cotton saw Officer Edwards standing in the front yard with a drawn gun. He saw Bobby Tolan standing to his left in the yard and Marian Tolan "moving around the front yard." Sergeant Cotton saw "at least" Anthony Cooper lying on the sidewalk. He did not at first see Robbie Tolan. Marian Tolan "was in dynamic movement, so [Sergeant Cotton] doesn't remember the -specific spot that she was in. She was moving around from Officer Edwards' left to in front of him to his right, kind of all in that area in front of him." Officer Edwards was pointing his gun toward Cooper and Robbie Tolan. {*R 1028-1030*}.

Sergeant Cotton drew his handgun and moved to Officer Edwards. Officer Edwards told Cotton "the two on the ground had gotten out of the stolen vehicle." By then, Sergeant Cotton could see a part of Robbie Tolan's hands or head sticking

out past the planter on the porch. {*R 1031-1032*}. Sergeant Cotton believed it necessary to search and handcuff the suspects but Marion Tolan was in front of Officer Edward's pointed gun, "so [Sergeant Cotton] needed to get her controlled before [he] could move onto the suspects." Although Marian Tolan was "putting herself between [Officer Edward's] weapon and Anthony Cooper and Robbie Tolan," Sergeant Cotton did not interpret her actions as trying to block a shot from Officer Edward's gun. Rather, "she was just moving around kind of not really paying attention to the gun, just very agitated and - and upset and moving kind of all over the scene." {*R 1032*}. She was also talking as she moved. Sergeant Cotton paraphrased her comments, "What are you doing here, we live here, you shouldn't be here, those kinds of things." {*R 1032-33*}. The exterior lighting consisted of a gas lamp "out front," which shed "some, but not a lot" of light, "more decorative than-than illuminating" and two spotlights on the driveway. The area in which Cooper was situated was better lit than the porch, which was "fairly dark." Robbie Tolan was lying "with his feet toward the driveway and his head toward the front door," with his arms stretched out in front of him, "more like Superman" than an airplane, and his fingertips "pointing towards the front door." {*R 1034-1035*}. After speaking to Officer Edwards, Sergeant Cotton's attention focused toward Marian Tolan, whose behavior "heightened [his] tension." {*R 1035-1036*}. "I identified her as being part of a scene that was out of control that was going to

have to be controlled before we could move forward." {*R 1036*}. "What needed further control was that both the felony suspects needed to be cuffed and searched," and at that point Marian Tolan was "hindering [his] ability to cuff and search the two felony suspects." {*R 1036*}. Sergeant Cotton asked Marian Tolan "several times" to move to the garage door. Her response was "noncompliant, kind of argumentative. She was upset and continuing to protest." {*R 1036-37*}. Marian Tolan said, "[w]e live here, what are you doing here, you shouldn't be here, and that's our car." Sergeant Cotton's only response "was to tell her to calm down, to let us do our investigation, we'll work everything out," yet she was still noncompliant. Marian Tolan "maybe took one or two steps towards the garage door, and then stopped and began protesting again." They were not close to the garage door, but "still on the driveway or kind of on the edge of the driveway to Officer Edwards' right." {*R 1040*}. "As soon as [he] addressed her, [Sergeant Cotton] holstered [his] weapon and then was trying to gain her compliance. When Marian Tolan would not comply, Sergeant Cotton "grabbed her right arm, [he] believe with [his] right hand, and put [his] left hand at the small of her back to start escorting her over to the garage door." {*R 1042*}. Marian Tolan was talking as Sergeant Cotton was escorting her, and soon after he first touched her, "she flipped her arm up trying to flip my-hand off of her and said, 'Get your hands off of me.'' {*R 1042*}.

9

All the while he was walking her in the direction of and getting closer to the garage door. {*R 1043*}. Sergeant Cotton was gripping her arm, "not as hard as I could, but enough to-to gain control of another person." As he and Marian Tolan moved toward the garage door Sergeant Cotton passed the planter on the porch and got a clearer view of Robbie Tolan lying on the porch. {*R 1044*}. Officer Edwards was still attempting to cover Robbie Tolan and Anthony Cooper until they could be secured. {*R 1044-45*}. When Sergeant Cotton and Marian Tolan were almost to the garage door, Sergeant Cotton glanced at Robbie Tolan on the porch and then turned his attention back to Marian Tolan at which point he heard Robbie Tolan yell, "Get your fucking hands off her." When Sergeant Cotton heard Robbie Tolan yell, he also observed Robbie Tolan getting up and turning.  Sergeant Cotton pushed Marian Tolan away from him in order to address Robbie Tolan and to get Marian Tolan out of the way. {*R 1045-1046*}. Robbie Tolan had before been lying down on the porch, hands outstretched towards the front door, but when Sergeant Cotton looked at Robbie Tolan after he said "Get your fucking hands off her," Robbie Tolan "was already partially up" and admittedly angrily turning toward Sergeant Cotton. When Sergeant Cotton looked again after hearing him, Robbie Tolan was already getting up, probably halfway up or so, and was turning to his right rotating with his face toward the window. {*R 1047*}. "When I first looked, he was-still had his back, for the most part, to me in the process of rotating" to

confront Sergeant Cotton. {*R 1047, 1048*}. After hearing Robbie Tolan yell, Sergeant Cotton turned and saw Robbie Tolan "was up in a crouch kind of in the process of getting up with his feet under him facing kind of away from me while-as he was rotating to his right." {*R 1048-49*}. Sergeant Cotton observed Robbie Tolan's right hand at his waistband but he could not determine where Tolan's left hand was. By "at his waistband," Sergeant Cotton meant "in the middle of his waist," "in the center of his body," "where his belt buckle would be." {*R 1049*}. Robbie Tolan was wearing a dark, zippered hoodie that was not tucked into his pants. {*R 1049*}. Sergeant Cotton believed Robbie Tolan was drawing a weapon from his waistband. Sergeant Cotton could not see Robbie Tolan's hand, but could see where Tolan's hand was. The dim lighting allowed Cotton to "see [Tolan's] total movement, which is what made [Cotton] believe that it wasn't necessarily just where his hand was, for instance." Sergeant Cotton knew that Robbie Tolan had his hand in the vicinity of his waistband. *Id.* {*R 1051*}. Sergeant Cotton believed Robbie Tolan "was drawing a weapon to shoot [Sergeant Cotton]." Sergeant Cotton was in fear of his life. It was not any one thing that made him afraid, but the "totality of everything that was happening that put [him] in fear, which included the way Robbie Tolan was getting up and where his hand was and -while he was getting up." {*R 1052-1053*}.

## ARGUMENT AND AUTHORITIES

### I.    The panel correctly applied the factual record to existing jurisprudence of this Court and the Supreme Court.

There is no issue that warrants en banc consideration of the panel's decision because it correctly applied the evidentiary record to existing jurisprudence of this Court and the Supreme Court. While posed as a plea to preserve consistency in decisions of this Court, Tolan actually seeks review of the panel's decision based upon insupportable argument consisting of self-serving mischaracterizations of the evidence under claimed legal standards that conflict with the well-reasoned decisions of this Court and the Supreme Court. The panel appropriately based its decision on the established legal principle that a police officer does not forfeit his qualified immunity when, like here, an officer could have reasonably interpreted the perceived threat posed by a suspect sufficient to justify the use of deadly force. *See Ontiveros*, 564 F.3d at 383 n. 1. In evaluating the circumstances when an officer can reasonably interpret such a threat, this Court has consistently held that when a suspect, like the record establishes Robbie Tolan did here, defies a police officer's commands for reasonable compliance during a police investigation, undertakes action that causes the suspect's hands to be concealed from the investigating officer's view, and thereafter the suspect causes his body, and particularly his hands, to move quickly from a position outside an officer's line of sight toward a police officer, a reasonable police officer may, in accordance with a

long line of decisions of this Court, regard such action as posing a potential threat of serious harm to the officer or to others which justifies an officer firing in self-defense, consistent with the practical necessity of defensive action and police training, as the panel found in this case. It is not by happenstance that reasonable officers fire in response to the actions this Court has found to justify an officer in shooting. The evidence admitted in this case, and similar evidence discussed in prior decisions of this Court, demonstrate that an officer who fails to respond decisively to such threatening actions is leaving his fate to mere chance. Qualified immunity serves to reconcile the practical requirements of a police officer's necessary defensive action and determination of civil liability for reasonable conduct undertaken in uncertain circumstances. This Court has consistently applied the Fourth Amendment and immunity in a manner that is consistent with the needs of a reasonable policeman on the scene. This is **the clearly established legal standard** this Court's decisions embody over for at least a 28 year period since this Court's decision in *Young supra*, and the standard the Supreme Court demands in such cases as explained by *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S.Ct. 596, 600 (2004).

Tolan asks this Court to deviate from its prior well-reasoned decisions and reject the clearly established law, as well as the thorough analysis and recitation of the admissible material evidence performed by both the panel and District Court

which led each to independently determine Sergeant Cotton's response to Robbie Tolan's actions did not violate clearly established law. Tolan presents a self-serving mischaracterization of events, tellingly styled "the plaintiff's version of the facts,"[3] which is largely insupportable in light of the well-developed record essential to determining how a reasonable police officer on the scene would have made a judgment about the level of force necessary to respond to the apparent threat Robbie Tolan presented to Sergeant Cotton. To do as Tolan asks, would substantially change the immunity standard in contravention of the jurisprudence of the Supreme Court and would create irreconcilable conflict in the well-developed policy underpinnings of immunity. The Supreme Court commands that evaluation of a police use of force **must** be undertaken from the *perspective of a reasonable police officer* on the scene, not Tolan's subjective perspective. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). As the Supreme Court requires, "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's use of deadly force]." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 2158 (2001).

---

[3]     Tolan's petition for rehearing en banc at page 1.

Analysis of the evidence under this controlling substantive law, as the panel and District Court have done, establishes that no reasonable fact finder could conclude Sergeant Cotton is not immune. Contrary to Tolans' erroneous assertions that "[t]here is no decision remotely similar to this one," the panel's decision is well founded on several well-reasoned decisions of this Court. A long line of prior decisions of this Court are similar to the situation Sergeant Cotton encountered in this case. In *Young*, this Court held "[n]o right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Id*. In *Young*, this Court found Young's movements at the moment of the shooting gave Officer Olson reasonable cause to believe a threat of serious physical harm existed. *Id*. at 1353. In *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), this Court similarly held that "[t]he sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm." *Id*. at 502. In *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007), this Court analyzed the relevant proximity and temporal factors and found "[g]iven the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force." *Id*. at 322. In *Ontiveros*, Lt. Logan encountered Ontiveros in low light holding a boot. Ontiveros reached inside the boot and Lt. Logan interpreted this action as Ontiveros reaching for a weapon. Accordingly, Lt. Logan shot Ontiveros. *Id*. at 381.

In *Ontiveros*, this Court held "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Id*. at 382. The *Ontiveros* Court reiterated the clearly established law of this Court.

> Even if the plaintiffs established that the officer used excessive force (and thus performed an unreasonable seizure under the Fourth Amendment), the court would perform an entirely separate inquiry applying a different reasonableness standard. In order to evaluate the "clearly established law" prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right. This inquiry focuses not on the general standard -when may an officer use deadly force against a suspect? - but on the specific circumstances of the incident - could an officer have reasonably have interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force? *Brosseau v. Haugen*, 543 U.S. 194, 199-200, 125 S.Ct. 596 (2004).
>
> > Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity. *Id*. at 201, 125 S.Ct. 596; *see also Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034 (1987). ("Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotations omitted).

*Ontiveros*, 564 F.3d at 383 n. 1.

Texas Ranger Jeff Cook explained in *Ontiveros*, the exigency confronting police officers faced with a similar, inchoate, threats.

> Q.    If Lieutenant Logan perceived Mr. Ontiveros's actions as Mr. Ontiveros putting his hand inside the boot do you think it would have been necessary for Lieutenant Logan to wait until Mr. Ontiveros exhibited a weapon before taking defensive action?

16

A.  Absolutely not.

Q.  And why not?

A.  Because he will then be behind the curve on reacting. Action is always-action always beats reaction.

Q.  If Mr. Ontiveros had a handgun in this boot, would there be any threat to Lieutenant Logan by Mr. Ontiveros just leaving his hand in the boot?

A.  Absolutely.

Q.  And why so?

A.  Because you can shoot through a boot. If Mr. Ontiveros had a weapon, a gun in the boot, he could simply fire through the boot at Officer Logan.

Q.  And do you think that it's likely that Lieutenant Logan would have had enough time to take appropriate steps to protect himself if he waited until Mr. Ontiveros removed a handgun from the boot if he had had one in there?

A.  No. Once again, action beats reaction. If someone pulls a gun-I don't know if you want me to go into that or not but-

Q.  Explain that for us.

A.  **Action is going to beat reaction every time**. For example, if I have-**if I have a gun and my brain-I have made the decision to shoot, then that message is going to travel down to my muscles and I'm going to shoot**. **For you to react to that-I have already started a process. You have to recognize it, then your brain has to tell your muscles to react, and then you're reacting to my actions. So action is going to beat reaction simply because of the cognitive element involved**.

Q.  Have you observed a training exercise where one training officer stands across a room from an officer, for example, and the training officer has his hand down next to his body with a gun in it and then the other officer is supposed to react? Have you seen that kind of training exercise?

A.  I actually participated in that training about three weeks ago.

Q.  Can you explain that in detail, how that training section works?

A.  Well, we had **simunition guns**. I don't know if I need to explain, but it's guns that look and feel real but they don't shoot real bullets. And literally, **I stood there and pointed a gun at the instructor and the instructor had the gun actually pointed to the ground and just told me to shoot whenever he acted**. And **I could not shoot him before he shot me. At best,**

> **I could tie him**. He could bring the gun up, pull the trigger before I could pull the trigger. I never beat him, and at best I could tie him.
>
> Q.    Is a tie good enough in this work?
>
> A.    No, **a tie, you die**, you know.

564 F.3d at 384, n. 2 (emphasis added).

As in the instant appeal, this Court recognized the *Ontiveros* plaintiffs rested their argument on claimed disputes that were not material to the issue of immunity, mere attempts to use "undisputed facts to imply a speculative scenario that has no factual support." *Id* at 383.  In rejecting an approach very similar to that advanced by Tolan in the instant appeal, this Court explained, "[h]indsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted [the suspect's] actions." *Id*. at 384. A plaintiff's "conjecture arising from undisputed facts that do not materially contradict [the officer's] testimony" about why he fired, does not preclude summary judgment or provide grounds for denial. *Id*. at 385.

In *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009), this Court found that "[w]hen Manis appeared to retrieve some object and began to straighten up, Zemlik fired four rounds killing Manis." *Id*. Again, like Tolan, the *Manis* plaintiffs proffered arguments regarding why Manis may have acted as he did such as he "only moved his arms out of drunken confusion, not combativeness," "Manis, oblivious to his fastened seat belt, tried unsuccessfully to get out of the Jeep," and

that Officer "Zemlik shot Manis as he was attempting to straighten up and raise his hands in a display of submission." *Id*. In *Manis*, this Court reaffirmed the applicable legal standard that "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Id*. at 843.

In *Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011), Carnaby "began to swing his hands - one of which was grasping an object - around toward Washington. Seeing that, Foster fired his weapon through the car and hit Carnaby in the back." *Id* at 186. Carnaby did not have a weapon on his person, only a cell phone was found on the ground near Carnaby later. *Id*. at 186-87. This Court found "[t]he officers were trying to prevent serious injury or death, so their use of force was reasonable, and we need not proceed further in the qualified immunity analysis." *Id*. at 189.

All of these decisions of this Court, which support the panels' decision, demonstrate the standard applicable to resolution of immunity. Notably, these cited prior decisions held as the District Court did here that no Fourth Amendment violation even occurred. The panel did not determine the District Court erred in its decision regarding the underlying Fourth Amendment claim but chose, instead as it

may under Supreme Court authority, to evaluate Sergeant Cotton's claim of immunity under the clearly established law prong of the immunity test.

In performing its analysis based upon the second prong of the immunity test, the panel did not, as the Tolans argue, "Drastically Lower[] the Threat Level Necessary to Justify Deadly Force." To the contrary, the prior decisions of this Court demonstrate the threat level necessary to justify deadly force under the Fourth Amendment. *See id.* As such, the Tolan panel has not broadened the dimensions of a Fourth Amendment claim but, instead, issued a narrow decision which pertains only to a determination of clearly established law in this instance alone, based upon the precedent of this Court and the Supreme Court. Certainly the decisions of this Court discussed *supra*, all of which held no constitutional violation occurred in circumstances similar to those Sergeant Cotton encountered, cannot be construed to show a violation of *clearly established* law in the circumstances of this case. Sergeant Cotton could not be forewarned that reliance upon the prior decisions of this Court discussed *supra* could result in his being denied immunity. Correct application of the controlling legal authorities of this Court to the admissible record evidence supports judgment in Sergeant Cotton's favor, as the panel and the District Court found.

**II.    The panel correctly applied jurisprudence of the Supreme Court.**

The panel also correctly applied relevant jurisprudence of the Supreme Court so rehearing is not necessary to correct any error. Essentially, Tolan argues the panel erred by not basing its holding on a finding no Fourth Amendment violation occurred as the District Court did, instead of the clearly established law element of the immunity test. This curious contention, if credited, could only lead to a broader decision from this Court en banc that no constitutional violation occurred, an issue the Supreme Court has held need not be determined when, as here, no violation of clearly established law is established. *See Pearson v. Callahan*, 555 U.S. 223, 2227, 129 S.Ct. 808, 813 (2009). Tolan invites this purely academic exercise only in the interest of allegedly bringing the panel's decision into compliance with a claimed procedural dictate of *Saucier*, and resolving claimed confusion in proper evaluation of a claim to immunity. Such an exercise is unnecessary, however, because the panel committed no procedural error and no confusion in immunity jurisprudence exists that must, or even can consistent with Supreme Court authority, be resolved by this Court en banc.

Tolan basically seeks an end-run challenge to the panel's immunity holding by asserting arguments the Supreme Court already considered and rejected. Contrary to Tolan's suggestion, *Saucier* did not invoke a change in the law that supports Tolan's argument. The opinion in *Saucier* did, for a time, require courts

performing a qualified immunity analysis to determine whether a constitutional violation occurred before considering whether the violation was clearly established, but that regimented procedure was superseded by the Supreme Court's decision in *Pearson*, 555 U.S. at 243, 129 S.Ct. at 822. Tolan acknowledges the panel could under *Pearson*, base its decision solely on the second portion of the test without addressing whether a constitutional violation occurred, but nonetheless complains doing so will operate to frustrate the development of Fourth Amendment law. The Supreme Court considered this argument, both ways, and has spoken on this specific issue demonstrating it has rejected Tolan's argument. *See id.*

The *Saucier* decision did not, otherwise, reflect *any* change in the law that would operate to render "pre-*Saucier* case law" invalid, as Tolan argues. The Supreme Court has never held that the evaluation of an alleged violation of clearly established law must be undertaken without regard to the factual circumstances of the case. Basically, Tolan seeks to contort the sound principle that evaluation of clearly established law is generally a legal question for the court, into a contention it must be decided without regard to the factual circumstances of the case. Tolan cites isolated excerpts from a few judicial decisions as claimed support for this novel legal contention but, even if Tolan's unique constitutional interpretation could be viewed to support a fundamental change in the law, Sergeant Cotton

would still be protected by immunity. As the Supreme Court discussed in *Brosseau*, case decisions that postdate the conduct in question "could not have given fair notice" to an officer accused of using excessive force and "are of no use in the clearly established inquiry." *Brosseau,* 543 U.S. at 200, 125 S.Ct. at 600 n. 4.

More fundamentally, however, no discernible authority supports Tolan's assertion a valid analysis for violation of clearly established law can be undertaken without consideration of the factual circumstances of a claim. As this Court, relying upon *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034 (1987), has explicitly recognized "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Ontiveros*, 564 F.3d at 383 n. 1.

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that **what he is doing** violates that right.

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (emphasis added).

In *Anderson*, the court of appeals erred when it "refused to consider the argument that it was *not* clearly established that **the circumstances** with which [FBI Agent] Anderson was confronted did not constitute probable cause and

exigent circumstances." *Id*. (emphasis added). As early as 1987, the Supreme Court explained that:

> [I]t is inevitable that law enforcement officials will in some cases **reasonably but mistakenly conclude** that probable cause is present, and we have indicated that in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable.

*Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039-40 (emphasis added).

"The relevant question in this case, for example, is the objective (**albeit fact-specific**) question whether a reasonable officer could have believed [the officer's action] to be lawful, in light of clearly established law and the information the [] officers possessed." *Id*. (emphasis added). "The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when **their conduct** may give rise to liability for damages.'" *Anderson*, 483 U.S. at 646, 107 S.Ct. at 3042 (emphasis added).

The Supreme Court made clear, in *Anderson*, that appropriate consideration of an alleged violation of clearly established law entails consideration of the **fact-specific circumstances** confronting the officer so that he can reasonably anticipate **what he is doing**, **his specific conduct**, violates clearly established law. For more than 25 years it has been well-established that an officer may reasonably, but **mistakenly, conclude his actions** comply with constitutional restrictions and yet retain his qualified immunity. *See id*.

In *Saucier*, the Supreme Court simply reinforced these *same* established principles in the context of a use of force claim. "The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in *Anderson*." *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158. "The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2159. Notably, the Supreme Court expressly discussed in *Saucier* that those lower court opinions that had erroneously interpreted *Anderson* differently, as Tolan asks this Court to do, cannot be reconciled with qualified immunity jurisprudence. *Saucier*, 533 U.S. at 200, 121 S.Ct. at 2155.

Even before *Saucier*, this Court did not violate the Supreme Court's dictates regarding a proper immunity analysis as some other courts had. *See Katz v. U.S.*, 194 F.3d 962, 967-71 (9th Cir. 1999) (collecting cases). Before *Saucier,* some courts outside the Fifth Circuit wrongly merged the objective reasonableness components in the constitutional analysis and clearly established law analysis like Tolan invites this Court to do now, but the Supreme Court expressly rejected such an approach in *Saucier supra*. Prominently, in *Saucier* when discussing evaluation of the *clearly established law* component of qualified immunity, the Supreme

Court specifically quoted *Anderson* as quoted *supra* in this brief. The basic Fourth Amendment test of *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989), "does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances." *Saucier*, 533 U.S. at 205, 121 S.Ct. at 2158.

> Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force." *Priester v. Riviera Beach*, 208 F.3d 919, 926-927 (11th Cir. 2000), and to ensure that before they are subjected to suit, officers are on notice **their conduct** is unlawful.

*Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158 (emphasis added).

Section III of the *Saucier* decision, in which the Supreme Court applied the clearly established law component of the immunity test, plainly reveals the folly of Tolan's argument. The Court assumed for purposes of analysis "a constitutional violation could have occurred" and explained "[t]hough it is doubtful that the force used was excessive, we need not rest our conclusion on that determination." *Saucier*, 533 U.S. at 207-208, 121 S.Ct. at 2159. The Supreme Court, thereafter, performed precisely the analysis the panel of this Court conducted in the Tolan case evaluating the facts and circumstances perceived on the scene by Officer Saucier that could have led a reasonable officer in his position to believe his conduct "was within the bounds of appropriate police responses." *Saucier*, 533

U.S. at 208-209, 121 S.Ct. at 2159-2160. "**In the circumstances presented to this officer**, …, no one "has identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did, nor are we aware of any such rule." *Saucier*, 533 U.S. at 209, 121 S.Ct. at 2160 (emphasis added).

Furthermore, in *Pearson*, the Supreme Court stated unequivocally:

> The protection of **qualified immunity applies regardless of whether** the government official's error is "**a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.**" *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004) (KENNEDY, J., dissenting)(quoting *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894 (1978), for the proposition qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law.").

*Pearson*, 555 U.S. at 231, 129 S.Ct. at 815 (emphasis added).

"In some cases, a discussion of why the **relevant facts** do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Pearson*, 555 U.S. at 236, 129 S.Ct. at 818. Nevertheless, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. at 818.

Thus, in addition to the unequivocal language within the relevant Supreme Court decisions, evaluation of the analysis done by the Supreme Court in its

decisions undeniably demonstrates it considers, and gives great weight to, the specific facts and circumstances the officers encounter when determining whether a violation of clearly established law occurred. *See Anderson, Saucier, Brosseau, and Pearson supra.* Appropriate determination of whether a police officer can reasonably believe his conduct conforms to clearly established law requires a detailed analysis of the relevant facts, as the Supreme Court's decisions unequivocally establish. *See Messerschmidt v. Millender*, __, U.S. __, 132 S.Ct. 1235, 1250 (2012).

The decisions of courts outside the Fifth Circuit that Tolan identified in his brief likewise fail to support his argument. Tolan merely identifies buzzwords within those decisions out of any relevant context. When the opinions are legitimately analyzed, it is clear they do not support Tolan's contention. Instead, these cases reveal that a factual analysis is absolute necessary to evaluate whether a right is clearly established in the circumstances of each specific case.

In fact, no appellate circuit has adopted Tolan's argument that determination of clearly established law must be undertaken without analysis of the factual circumstances of the case.[4] Therefore, the panel's decision, and method of analysis, does not conflict with any other federal circuit.

---

[4]    *See Higgins v. Penobscot County Sheriff's Department*, 446 F.3d 11, 13-15 (1st Cir. 2006); *Doninger v. Niehoff*, 642 F.3d 334, 352-356 (2nd Cir. 2011); *Schneyder v. Smith*, 653 F.3d 313, 329-331 (3rd Cir. 2011); *U.S. v. McKenzie-Gude*, 671 F.3d 452, 461 (4th Cir. 2011); *Hensley v. Gassman*, 693 F.3d 681, 694 (6th Cir. 2012); *Abbott v. Sangamon*

## CONCLUSION AND PRAYER

Accordingly, en banc review of the panel's decision is unnecessary because the panel correctly applied relevant jurisprudence and properly based its decision regarding application of clearly established law to the relevant facts stemming from the rapidly evolving, challenging circumstances presented to Sergeant Cotton in which Tolan defied commands for reasonable compliance, engaged in overt action which caused his hands to be concealed from Sergeant Cotton's view, and caused Tolan's body, including his hands, to quickly move from a position outside Sergeant Cotton's line of sight toward him. Any reasonable police officer under these circumstances should, and certainly could, have perceived Tolan's action as posing a potential threat of serious harm to Sergeant Cotton such that firing in self-defense was appropriate. The panel correctly found Sergeant Cotton immune under the circumstances evidenced by the record, and in clear accord with the decisions of this Court and the Supreme Court, so no review is called for. The Panel's decision is consistent with the controlling decisions of the Supreme Court and this Court and, thus, should not be reversed. Sergeant Cotton, therefore, prays that this Court deny the Tolans' petition for rehearing en banc.

---

*County*, 705 F.3d 706, 726-729 (7th Cir. 2013); *Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012); *Mattos v. Agarano*, 661 F.3d 433, 446-448 (9th Cir. 2011); *Kerns v. Bader*, 663 F.3d 1173, 1181-1183 (10th Cir. 2011); *Terrell v. Smith*, 668 F.3d 1244, 1256-1257 (11th Cir. 2012); *Youngbey v. March*, 676 F.3d 1114 (D.C. Cir. 2012).

Respectfully submitted,

*/s/Norman Ray Giles*
WILLIAM S. HELFAND
Attorney-in-Charge
State Bar No. 09388250
NORMAN RAY GILES
State Bar No. 24014084

OF COUNSEL:

CHAMBERLAIN, HRDLICKA, WHITE,
     WILLIAMS & AUGHTRY
1200 Smith Street, Suite 1400
Houston, Texas  77002
713-654-9630
713-658-2553 (Fax)
ATTORNEYS FOR APPELLEES

## CERTIFICATE OF SERVICE

     I hereby certify that the foregoing document has been filed in the office of the Clerk of the Fifth Court of Appeals and a true and correct copy of same has been provided to counsel listed below via CM/ECF System on this 3rd day of June 2013.

     Martin J. Siegel
     Law Offices of Martin J. Siegel, P.C.
     Bank of America Center
     700 Louisiana Street, Suite 2300
     Houston, Texas 77002

*/s/Norman Ray Giles*

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Circuit Rule 32.2 and 32.3, the undersigned certifies this

brief complies with the typed-volume limitations of FED. R. APP. P. 32(a)(7).

    1.     This brief complies with the type-volume limitation of Fed R. P.

32(a)(7)(B) because:

       X   this brief does not exceed 30 pages pursuant to FED. R. APP. P. 32(a), excluding parts not counted under Rule 32(B)(iii) or

    ____   this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

    2.     This brief complies with the typeface requirements of FED. R. APP. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

       X   this brief has been prepared in a proportionally spaced typeface using **Microsoft Word 2010** in **Times New Roman, 14 point**.

    ____   this brief has been prepared in a monospaced typeface using

_____ with _____.

*/s/Norman Ray Giles*_____